John H. DRAKE II, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 85C 8970.

United States District Court,
N.D. Illinois, E.D.

Aug. 19, 1986.

Fred M. Ackerson, Mayer, Brown & Platt, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., James J. Kubik, Asst. U.S. Atty., Chicago, Ill., Richard M. Prendergast, Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Drake II ("John") sues the United States under 28 U.S.C. § 1346(a)(1), claiming the Internal Revenue Service ("IRS") overassessed his income tax liability for 1982 and 1983. John has paid the assessed taxes and seeks a refund (see 26 U.S.C. §§ 6532(a) and 7422(a)).[1] Now John has moved for summary judgment under Fed. R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, the motion is granted and the refund ordered.[2]

---

1. All further citations to Internal Revenue Code ("Code") provisions will simply take the form "Section—," using the Title 26 section numbering.

2. Initially the United States urged John had not filed a refund claim as to the 1983 assessment, so this Court would not have subject matter jurisdiction over that aspect of the case (see Sections 6532(a)(1) and 7422(a)). Recently counsel for the United States has advised this Court's law clerk that further review of IRS' records shows the 1983 claim was indeed filed, as John has asserted (and as his R.Mem.Ex. 2, IRS' denial of that claim, plainly reflects). This

## Facts [3]

John and his wife Linda ("Linda") were married in 1964 (¶ 2). In 1978 they purchased two Florida condominiums as investments, taking each by a warranty deed (¶ 3 and Exs. A and B) running to:

JOHN HAROLD DRAKE and LINDA L. DRAKE, husband and wife....

In 1980 Linda filed a divorce action in the Circuit Court of Cook County, Illinois (the "Circuit Court"). John and Linda entered into a marital settlement agreement (the "Settlement Agreement") February 20, 1981, and their marriage was dissolved March 9, 1981. In accordance with common practice, the Circuit Court's judgment for dissolution of marriage incorporated the Settlement Agreement by reference (¶ 5 and Ex. C).

Settlement Agreement ¶¶ 5(b) and (c) (Ex. C, at 13–15) provided for disposition of the condominiums: [4]

The parties hereto agree that JOHN shall have the option of purchasing the interest of LINDA in the above unit within thirty (30) days of the sale and closing of the marital residence as provided for hereinabove. JOHN agrees to pay to LINDA the sum of $38,000.00 representing her one-half interest in the net equity.... In the event that JOHN does not elect to purchase the interest of LINDA in said condominium unit the parties hereto agree that the above unit shall be placed on the market for immediate sale and that upon the sale and the closing thereof the net proceeds derived therefrom shall be equally divided between them....

On May 29, 1981 John exercised his option to purchase Linda's condominium interests, receiving two quit-claim deeds (¶ 7 and Exs. D and E).

On his 1982 and 1983 tax returns, John claimed 30–year straight-line depreciation deductions for his original (1978–acquired) interests in the condominiums (for that purpose he treated his original basis as one-half of their initial purchase price). But he claimed 15–year accelerated-cost-recovery-system ("ACRS") deductions under Section 168 for the interests he acquired from Linda in 1981. IRS audited those returns and assessed a deficiency, claiming John was not entitled to ACRS deductions on the interests acquired from Linda (¶ 9; see also Prendergast Aff. Ex. 3, at 3, the IRS worksheet for John's 1982 return).

## Opposing Contentions of the Parties

Under Section 168(e)(1) ACRS deductions are not available for "property placed in service by the taxpayer before January 1, 1981." Section 168(e)(4)(B)(i) further excludes from ACRS treatment:

property acquired by the taxpayer after December 31, 1980, if—

(i) such property was owned by the taxpayer or by a related person at any time during 1980....

For its part the United States argues John is doubly barred from the claimed deductions:

1. Under Florida law John and Linda held the condominiums as tenants by the entirety.[5] Thus John in effect owned the

---

opinion therefore addresses only the merits of John's refund claims and not the previously-advanced jurisdictional issue. Because the advice that it is really a nonissue has been given only orally, the United States is ordered to file a written confirmation of that fact on or before August 28, 1986.

**3.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case the United States (*Anderson v. Liber-*

*ty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). Because John R. Mem. 3–4 has made several factual concessions, there are no material factual disputes. All references to "¶ —" and "Ex.—" are to John's affidavit and its attached exhibits.

**4.** Each condominium was covered by its own paragraph (with identical wording) in the Settlement Agreement.

**5.** Just a word about terminology: It is uncertain whether purists would speak of "entirety" (see, e.g., 2 Blackstone, *Commentaries* *182) or "entireties" (see, e.g., authorities referred to in Lewis' 1897 edition of Blackstone, footnoting the

whole property and placed it into service before January 31, 1981.[6]

2. Linda was a "related person" who during 1980 owned the interest she later sold to John.

John counters with several contentions:

1. Federal, not state, law governs the ownership question here, and in adopting the ACRS provisions Congress considered and rejected a "spousal attribution rule."

2. Even if the Florida tenancy by the entirety is relevant, the Code does not treat either tenant as outright owner of the property.

3. Whether or not persons are "related" for Section 168(e)(4)(B)(i) purposes is determined "as of the time the taxpayer acquires the property involved" (Section 168(e)(4)(D)). When John bought Linda out, the two were divorced and thus unrelated.

4. John's purchase of Linda's interests was a bona fide sale negotiated at arms' length, not a "churning" transaction designed for tax avoidance.

Each side scores some points, but in the end John clearly prevails.

### John's "Ownership" Before 1981

■ At the outset several issues must be cleared away. With rare exceptions property law (especially real-property law) is state law. Thus where the incidence of federal taxation turns on property ownership, state law usually determines who owns the property (*Poe v. Seaborn*, 282 U.S. 101, 110, 51 S.Ct. 58, 59, 75 L.Ed. 239 (1930); *Estate of Stewart v. Commissioner*, 79 T.C. 1046, 1048 (1982)). Further, where realty is concerned, the law of the state where the property is located controls (*Stewart*, 79 T.C. at 1048).

■ Under those principles ownership of the condominium interests is at least initially a matter of Florida law. But state prop-

erty law has not developed to mesh seamlessly with the Code, and though this opinion must begin with a discussion of Florida law, it would be oversimplistic to end there.

John and Linda held the condominiums under deeds to them as "husband and wife." At common law such deeds would automatically make them tenants by the entirety, for husband and wife were "considered as one person in law" (2 Blackstone, *Commentaries* *182). Indeed that "amiable" fiction meant husband and wife had insufficiently separate existences to allow them to take together as joint tenants or tenants in common (Moynihan, *Introduction to the Law of Real Property* 230 (1962)).

In Blackstone's day a husband and wife taking an estate together *as* husband and wife necessarily took that estate by the entirety. But with the demise of the husband-and-wife-as-one-legal-person fiction, the rationale for automatic creation of tenancies by the entirety when property is conveyed to "husband and wife" has disappeared as well. Consequently the modern Florida rule, holding such a deed creates a tenancy by the entirety (*Losey v. Losey*, 221 So.2d 417, 418 (Fla.1969) (footnote omitted)):

> rests "upon a rule of construction based on the presumption of intention," rather than on any peculiarity of marital incapacity.

Today the matter is one of choice. No actual unity compels the estate into being. Instead couples may take by the entirety if they wish, and a deed to them as "husband and wife" is—in Florida at any rate—sufficient to indicate that desire (*id.*).

But with husband and wife no longer treated as a legal unit, the key question here is not the mere presumptive creation of a tenancy by the entirety but rather its current significance, absent the common-law fictions and rote law-French quota-

---

same page). Because the Code has opted for the former, this opinion will follow the same usage.

**6.** Of course the Code frequently attributes one person's ownership to another for tax-law pur-

poses (see, e.g., Section 267, regarding constructive ownership of stock), but the United States' first argument rests on actual ownership, not on ownership by federal-law attribution.

tions.[7]  Some time ago New Jersey Chief Justice Weintraub put his finger on the problem and suggested an answer (*King v. Greene*, 30 N.J. 395, 153 A.2d 49, 60 (1959) (dissenting opinion)):

> The estate by the entirety is a remnant of other times.  It rests upon the fiction of a oneness of husband and wife.  Neither owns a separate, distinct interest in the fee; rather each and both as an entity own the entire interest.  Neither takes anything by survivorship; there is nothing to pass because the survivor always had the entirety.  To me the conception is quite incomprehensible. . . .
>
> Presumably the estate by the entirety was designed to serve a social purpose favorable to the parties to the marriage.

Thus the modern tenancy by the entirety essentially describes a form of ownership bearing the characteristics of the old common-law estate but existing for the sake of those characteristics, not as a necessary result of a fictional marital unity.  As *MacGregor v. MacGregor*, 323 So.2d 35, 38 (Fla.App.1975) said (emphasis in original):

> An analysis of the *reason for* and *basis of* the rule precluding separate conveyances of entireties property in terms of this set of facts establishes, we think, that it may not be applied so as to render the MacGregors' individual conveyances void.  The real, as opposed to the metaphysical *reason* for *this* rule, as in the case of the entire concept of the estate by the entireties (despite all the neo-Platonic references in the cases to the four "unities" which form its basis), is essentially to prevent the interest of one spouse in the entireties property from being adversely affected by the *independent* act of the other.

Tenancies by the entirety have two characteristics (aside from the requisite involvement of a married couple) that set them apart from other cotenancies:

1.  Neither tenant, acting alone, can sell or encumber all or part of the property (*Ohio Butterine Co. v. Hargrave*, 79 Fla. 458, 84 So. 376, 378 (1920)).

2.  When one spouse dies, the other takes the whole estate.  Just to state the doctrine, as in *English v. English*, 66 Fla. 427, 63 So. 822, 823 (1913), makes Chief Justice Weintraub's point:

> Upon the death of one spouse the entire estate goes to the survivor; but the survivor takes no new estate, since there is a mere change in the person holding, and not an alteration in the estate held.

See also *Lang v. Commissioner*, 289 U.S. 109, 111, 53 S.Ct. 534, 535, 77 L.Ed. 1066 (1933).  In its argument the United States does not really focus on those practical aspects of the tenancy.  Instead its whole rationale for John's pre–1981 "ownership" of the entire condominium property rests on the fictional unity of husband and wife as a single person and on the medieval theory of seisin "per tout et non per my."  From a practical (rather than a "neo-Platonic") viewpoint, the United States' argument hangs from a gossamer thread.[8]

This Court must begin with at least a presumption against the United States' approach.  As *United States v. Jacobs*, 306 U.S. 363, 369, 59 S.Ct. 551, 554–55, 83 L.Ed. 763 (1939) (footnotes omitted) teaches in a closely-related context:

> On the other hand, respondent explains the permissible taxation of the whole of a tenancy by the entirety by reference to

---

**7.**  United States Mem. 11 obligingly recites the ancient maxim that tenants by the entirety take "per tout et non per my" (by the whole and not by the half).  That situation contrasts with that of joint tenants, who take "per my et per tout" (by the half and by the whole).

**8.**  Just how gossamer is illustrated by an examination of the legal situation immediately before John's acquisition.  Consistently with common-law concepts, Florida Stat. § 689.15 confirms the destruction of a tenancy by the entirety

when husband and wife are divorced (though United States Mem. 11 begrudges even that fundamental proposition).  Thus there can be no question that, even on the United States' view of the legalities, John did not own the entire condominium property just before he bought Linda's interests.  What the United States' counting of angels on pinheads must depend upon, then, is not the parties' relationship on the date of the purchase transaction, but rather the statutory reference to 1980—when coverture still existed.

the "amiable fiction" of the common law, under which ownership of a husband and wife in tenancy by the entirety is deemed a single individual unity and each owns all and every part of the property so held. By virtue of this feudal fiction of complete ownership in each of two persons, the surviving tenant by the entirety is conceived to be the recipient of all the property upon the death of the co-tenant, and therefore—it is said—all the property can be taxed.

The constitutionality of an exercise of the taxing power of Congress is not to be determined by such shadowy and intricate distinctions of common law property concepts and ancient fictions.

This opinion turns, then, to the relevant—and less shadowy—considerations. It is familiar ground that "ownership" is not a fixed or formalistic concept but consists of an assorted "bundle of rights," sometimes more, sometimes fewer (*Northern Trust Co. of Chicago v. United States*, 193 F.2d 127, 129 (7th Cir.1951), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)). One of the most significant ownership rights is a person's right to dispose of what he or she owns. Here John had the right to prevent Linda from selling her interests—but Linda had precisely the same right as against John. Thus John had greater control over his cotenant's interests than he would have had as a joint tenant, but he had less control over his own share. If he "owned" Linda's interests, then quaere whether in the same sense he "owned" his own! And of course the linchpin of the United States' argument is not simply John's ownership of Linda's interests, but rather his ownership of the whole property.

In a practical sense, it is hard to see how either tenant can be said to own the property as a whole. Where a partnership (say) owns property, no individual owns the property, though one partner's act may bind the other partners. Neither tenant by the entirety can do even that. Long ago *Tyler v. United States*, 281 U.S. 497, 503–04, 50 S.Ct. 356, 359, 74 L.Ed. 991 (1930) recognized one tenant by the entirety had rights significantly fewer than the bundle usually associated with meaningful ownership over the whole:

> Before the death of the husband ... the wife had the right to possess and use the whole property, but so, also, had her husband; she could not dispose of the property except with her husband's concurrence; her rights were hedged about at all points by the equal rights of her husband. At his death, however, and because of it, she, for the first time, became entitled to exclusive possession, use and enjoyment; she ceased to hold the property subject to qualifications imposed by the law relating to tenancy by the entirety, and became entitled to hold and enjoy it absolutely as her own; and then, and then only, she acquired the power, not theretofore possessed, of disposing of the property by exercise of her sole will. Thus the death of one of the parties to the tenancy became the "generating source" of important and definite accessions to the property rights of the other.

In one sense that ends the case in the form tendered for decision. Rejection of the United States' first argument necessarily means John—having owned fewer than all the rights in the condominiums before 1981–acquired some "property" from Linda in 1981. However many rights were packed into the acquired bundle, it can scarcely be gainsaid they constituted "property" for Section 168(e)(1)[9] and 168(e)(4)(B)(i) purposes. And without doubt John paid $76,000 for that acquired property.

Of course that analysis has other potential ramifications. Even though the Settle-

9. Section 168(e)(1) in terms excludes from ACRS deductions property "placed in service by the taxpayer before January 1, 1981." United States Mem. 11 assumes only an "owner" can place property in service, but that really begs the question. Each of the statutory provisions speaks instead of (1) "property" and (2) the "taxpayer"—and (1) the acquired interests and (2) John, respectively, unquestionably match those terms.

ment Agreement refers to the acquired property as Linda's "one-half interest in the net equity" (surely the best evidence of what the parties *believed* they were bargaining for), if it were decided the purchase represented more or less than one-half, the necessary corollary would be that John's *prior* ownership had been less or more than one-half. And in turn that could entitle him to a lesser or greater amount of depreciation on the previously-owned interest than the amount he took (based, it will be recalled, on the half-ownership notion).[10] To minimize the metaphysical potential of such an approach, it is worth a brief look at two competing analogies that emerge from the intersection of the tax laws and tenancies by the entirety.

One analogy builds on the common-law concept that the surviving spouse takes no new estate from the decedent by way of inheritance or survival. *Lang*, 289 U.S. at 111, 53 S.Ct. at 535 said the survivor's basis in the property (for purposes of computing capital gain) was the original purchase price, not the fair market value on the decedent's death. Rejecting the applicability of Section 1014's statutory ancestor,[11] *Lang* (*id.*) reasoned:

> In the present case, therefore, when the husband died, the wife, in respect of this estate, did not succeed to anything. She simply continued, in virtue of the nature of the tenancy, to possess and own what she already had. Giving the words of the statute their natural and ordinary meaning, as must be done, it is obvious that nothing passed to her by bequest, devise, or inheritance.

See also *Faraco v. Commissioner*, 261 F.2d 387, 388 (4th Cir.1958), *cert. denied*, 359 U.S. 925, 79 S.Ct. 608, 3 L.Ed.2d 628 (1959) (*Lang* rule means surviving spouse's basis for depreciation purposes is original cost).

*Lang* therefore suggests a surviving tenant by the entirety owned *enough* of the whole property before the cotenant's death to justify nonapplication of the stepped-up basis provisions. That could in turn suggest the analogy (albeit strained) that John was enough of an owner before 1981 to justify nonapplication of ACRS deductions.

But that possible analogy has been robbed of whatever force it might have had by post-*Lang* statutory developments. Section 1014 now provides:

> **(a) In general.**—Except as otherwise provided in this section, the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent shall, if not sold, exchanged, or otherwise disposed of before the decedent's death by such person, be—
>
> > (1) the fair market value of the property at the date of the decedent's death....
>
> \*   \*   \*   \*   \*   \*
>
> **(b) Property acquired from the decedent.**—For purposes of subsection (a), the following property shall be considered to have been acquired from or to have passed from the decedent:
>
> \*   \*   \*   \*   \*   \*
>
> (9) In the case of decedents dying after December 31, 1953, property acquired from the decedent by reason of death, form of ownership, or other conditions (including property acquired through the exercise or non-exercise of

---

**10.** In an odd way, the United States could have proved too much by poor-mouthing the share represented by the acquired interest. Once that interest is given *any* recognition as "property," its $76,000 basis is the measure of John's allowable depreciation. But if it is treated as a less-than-half interest, John could claim not only the full share of depreciation on the $76,000 but also the more-than-half figure logically attributable to his previous ownership.

**11.** *Lang* construed Section 204(a) of the 1926 Revenue Act, 44 Stat. 9, 14, which read (289 U.S. at 111, 53 S.Ct. at 535):

> The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—
>
> \*   \*   \*   \*   \*   \*
>
> (5) If the property was acquired by bequest, devise, or inheritance, the basis shall be the fair market value of such property at the time of such acquisition.

a power of appointment), if by reason thereof the property is required to be included in determining the value of the decedent's gross estate under chapter 11 of subtitle B or under the Internal Revenue Code of 1939.

Thus a surviving tenant by the entirety is now entitled to a stepped-up basis in the property on which estate tax was paid. See *Booth,* 261 F.2d at 388.[12]

Section 1014(b)(9) does not actually overrule *Lang,* for that case had treated only with statutory language limiting step up to property acquired by "bequest, devise, or inheritance," and the case held the surviving spouse did not "inherit" anything in probate-law terms. Section 1014(b)(9) rather accords equivalent tax treatment to (among others) the surviving tenant by the entirety. See *Stanley v. Commissioner,* 338 F.2d 434, 438 (9th Cir.1964). In doing so Congress explicitly recognized it was economically unjust to treat the surviving spouse as having acquired valuable property rights for estate-tax purposes (under the *Tyler* rationale) while denying such rights had been acquired for capital-gain or depreciation purposes (*Booth,* 261 F.2d at 388; H.R.Rep. No. 1337, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad. News 4017, 4407–08). Though it could have achieved fairness by eliminating the estate-tax side of the imbalance, Congress chose to follow the economic reality clearly identified in *Tyler,* treating the surviving spouse as having acquired new property, even if that acquisition did not take the form of an "inheritance."

There is more. At the same time Congress enacted ACRS it amended Section 2040(b) to provide only half the value of any tenancy by the entirety is includable in the first-dying spouse's estate (rather than the whole value, see n. 12). That indicates a further move toward taxation based on the realistic attribution of half "ownership" to each spouse. And because the basis provisions in Section 1014(b)(9) take their cue from the estate tax, Section 2040(b) serves to give the surviving spouse a stepped-up basis in half the tenancy,[13] indicating the Code now treats a tenancy by the entirety as though it had "moieties" after all.

Another analogy strengthens that conclusion. It is relatively easy to speak of the tenancy's market value once one spouse has died, for then the survivor is free to dispose of the property in any open-market transaction. But while both spouses live neither has an alienable interest, so neither "owns" anything with market value in the traditional sense. Yet there are other ways of valuing property, one of which is according to the income stream it produces. Especially in a case like this one, where the property held by the entirety is a source of revenue, each spouse "owns" something of value as measured by the entitlement to income.

Thus some courts (e.g., *Commissioner v. Hart,* 76 F.2d 864, 867 (6th Cir.1935)) have held tenants by the entirety stand in a relationship very similar to that of spouses in community-property jurisdictions. Community income is taxable one-half to each spouse, regardless of who produces it (*Poe,* 282 U.S. at 111–13, 51 S.Ct. at 59–60; *Goodell v. Koch,* 282 U.S. 118, 121, 51 S.Ct. 62, 62, 75 L.Ed. 247 (1930)).[14] By extension

---

**12.** *Tyler,* 281 U.S. at 503–05, 50 S.Ct. at 359 and its progeny had already upheld Congress' imposition of a tax on the entire value of property held by the entirety at the time the first spouse died, expressly rejecting the argument that nothing of value actually passed to the surviving spouse. See also *Third Nat. Bank & Trust Co. of Springfield v. White,* 45 F.2d 911, 911–12 (D.Mass.1930), *aff'd mem.,* 58 F.2d 1085 (1st Cir.), *aff'd mem.,* 287 U.S. 577, 53 S.Ct. 290, 77 L.Ed. 505 (1932).

**13.** True enough, the Section 2056 marital deduction may insulate the "acquired" half interest

from estate taxation and thus from stepped-up basis. But the Code's policy of providing limited financial protection to surviving spouses does not detract from the internal logic of Sections 1014(b)(6) and 2040(b), which conceptually divide the entirety estate into two tax moieties.

**14.** Joint returns, authorized in their present form by Congress in 1948, effectively allow married couples in common-law jurisdictions to allocate their incomes equally, as would be required of couples under a community-property

*White v. Commissioner,* 18 T.C. 385, 386–87 (1952) said each tenant by the entirety must deduct half an income property's net operating loss, disallowing the husband's attempt to deduct the whole loss on his individual return.

That approach is certainly inconsistent with the notion each spouse "owns" the whole property, and it reinforces the notion each spouse owns a separate interest in an income (or deficit) stream. See also *Hart,* 76 F.2d at 867 (income from property held by the entirety is not taxable to the husband alone). And here, as under the survivorship cases, the incidence of taxation follows economic reality, for under Florida law neither spouse is entitled to take all the income in any event (*Lacker v. Zuern,* 109 So.2d 180, 182–83 (Fla.App.1959)).

\*   \*   \*   \*   \*   \*

When all is said and done, no matter what line of analysis is pursued, the United States' case for John's prior "ownership" of the whole condominium property cannot stand. John and Linda had economically distinct interests in that property, interests of the sort the Code in several places recognizes as separable for tax purposes.[15] Had John and Linda held as tenants in common (as they automatically became once they were divorced, see Fla.Stat. § 689.15), the United States' case wouldn't

even have gotten off the ground. In light of modern tax principles, nothing indicates tenancies by the entirety are to be treated any differently.[16]

In summary, the United States' position must be vindicated, if at all, under the "related person" antichurning provisions. This opinion therefore turns to them.

### *"Churning"*

■ Congress enacted ACRS to stimulate capital investment. Mere paper changes in ownership within a single economic unit clearly would not serve that purpose, so Congress included Section 168(e)(4)(B)(i) to exclude such "churning" transactions from ACRS coverage. If "at any time during 1980" John or a "related person" owned the property John acquired in 1981, John would not be entitled to take ACRS deductions.

During their marriage Linda was considered "related" to John under the Code (see Section 168(e)(4)(D)(i) and its cross-referenced Section 267(b)(1) and (c)(4), making a spouse a "related person"). But though Linda certainly owned the property "at any time during 1980," the statute does not look to *that* time to determine her status as "related" or not. Instead Section 168(e)(4)(D) says:

> The determination of whether a person is related to another person shall be made

---

regime. See 3 Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 76.1.1, at 76–4 (1981).

**15.** If those interests are indeed treated as distinct, they may presumably also be treated as equal (one-half each), consistently with the parties' own bargain as reflected in the Settlement Agreement. Nothing in the parties' submissions suggests anything else (as, for example, an actuarial valuation).

**16.** In February 1984 IRS issued a series of proposed regulations ("Proposed Regulations" or "Proposed Regs.," LR–185–81, 1984–1 C.B. 659). Proposed Reg. 1.168–4(d)(4)(iv) (1984–1 C.B. at 690) provides:
> *Undivided interests.* Subject to the provisions of paragraph (d)(7) of this section (relating to avoidance), if an undivided interest in property is acquired, and the resulting arrangement is not a partnership for tax purposes, then such interest shall be treated as a separate item of property for purposes of paragraph (d)(2) and (3) of this section.

It is not clear what status the Proposed Regulations currently enjoy. Their assigned Code of Federal Regulations numbering has been given to other, unrelated regulations (see 29 C.F.R. §§ 1.168–1 to 1.168–7 (1986)), indicating the Proposed Regulations never became effective. United States Mem. 12, seeking to rely on other Proposed Regulation sections, asserts they have "all the force and effect of law." John R.Mem. 11 n. 4 acknowledges their "only ... proposed" status but suggests the Proposed Regulations have "considerable persuasive force, as they were written by the Government's experts." This Court has already reached the same conclusion Proposed Reg. 1.168–4(d)(4)(iv) would mandate, so it need not consider (1) whether that Proposed Regulation alone is sufficient to require that conclusion or (2) whether its failure to become final (along with all the other Proposed Regulations) vitiates that conclusion. Nevertheless, in view of the United States' own assertion, Proposed Reg. 1.168–4(d)(4)(iv) must weigh on John's side of the balance.

as of the time the taxpayer acquires the property involved.

That provision is wholly consistent with the statutory purpose of making more favorable depreciation deductions unavailable to transactions unlikely to have economic reality because they lack the assurance of originating in arms-length deals. And the appropriate time to ascertain that is when the acquisition occurs, not some earlier point in time. At the time John bought Linda out, the couple was divorced—no longer "related."

United States Mem. 13 essays some legerdemain in an effort to avoid that logic—and the statute's plain language. It says John acquired his interest in the property while he and Linda were married, so:

> even if the plaintiff is considered to have "acquired" a new and distinct interest in the property in 1981, which the United States does not concede, the property fails to qualify for treatment under ACRS by virtue of the fact that "such property was owned by the taxpayer or by a related person at any time during 1980."

That is utter sophistry.[17] This opinion has already held John acquired new property in 1981. John seeks ACRS treatment only for that property. Though John and Linda were related in 1980, that relationship ended in 1981. Because John did not own the whole property in 1980, he was not related to Linda on the date he acquired her interests. Plainly the United States' "arguendo" reasoning makes no sense, for it translates to: "Even if John didn't own the property in 1980, he owned the property in 1980." [18]

In short, neither the statutory language nor its underlying principle justifies treating John's acquisition as a churning transaction for ACRS purposes.[19] On that issue, as on the first question dealt with at greater length, the United States is a loser.

### Conclusion

There are no genuine issues of material fact as to the merits, and John is entitled to a judgment as a matter of law. His 1982 and 1983 income tax returns were improperly found deficient, and the United States is ordered to pay John the refund he has sought attributable to the condominiums.[20]

---

17. That characterization may give the United States too much credit. "Sophistry" connotes at least surface plausibility, which the United States' position lacks.

18. Indeed, though United States Mem. 13 purports to bolster its argument with a citation to "Section 168(e)(4)(B)(i) and regulations prescribed thereunder," Proposed Reg. 1.168-4(d)(4)(iv) addresses this situation precisely, treating each undivided interest in real estate "as a separate item of property" in churning terms. See n. 16.

19. United States Mem. 11 also seeks to rely on Rev.Rul. 84-23, 1984-1 C.B. 38, but that ruling

is wholly inapposite. It addressed a situation where the same owner changed his house's use from a personal residence to rental income property after 1980. IRS said the taxpayer could not use ACRS because he had placed the property "in service" (albeit as a residence) before 1981. Here there is a change of ownership, not a change of use. *John* did not place the acquired property in service until 1981.

20. John's R.Mem. 3–4 concessions (see n. 3) acknowledge different calculations will be required as to the related personalty.